AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>Pedro Jesus SUAREZ-Aguilar | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.

**8:23MJ2511SPF**

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ August 2, 2023 _____ in the county of _____ Hillsborough _____ in the _____ Middle _____ District of _____ Florida _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii) | Possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine. |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Eric Hery, Drug Enforcement Administration
*Printed name and title*

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 41 (d)(3).

Date: 12/6/2023

_____
*Judge's signature*

City and state: _____ Tampa, FL _____

SEAN P. FLYNN, U.S. Magistrate Judge
*Printed name and title*

| Print | Save As... | Attach | | Reset |
|---|---|---|---|---|

I, Eric Hery, being duly sworn, state as follows:

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1.    I make this Affidavit in support of a criminal complaint charging **Pedro Jesus SUAREZ-Aguilar** with possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii).  As set forth below, I have probable cause to believe that **SUAREZ-Aguilar** did knowingly and intentionally possess with intent to distribute cocaine.

2.    I am a Special Agent of the Drug Enforcement Administration ("DEA"), United States Department of Justice.  I have been employed as a Special Agent with the DEA since March 2008 and I am currently assigned to the Tampa District Office.

3.    I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations of and make arrests for the offenses enumerated in 18 U.S.C. § 2516.

4.    The statements contained in this Affidavit are based, in part, upon my own personal knowledge, but are also based upon information provided to me by other law enforcement officers and persons familiar with possession with the intent to distribute cocaine. Because this affidavit is for the limited purpose of setting forth probable cause for the criminal complaint, I have not necessarily included every fact known to me through this investigation.

## Facts Supporting Probable Cause

5.    In or about April 2022, DEA Tampa's Enforcement Group 2 (EG2) initiated an investigation into a Drug Trafficking Organization (DTO). Utilizing information from a Hillsborough County Sheriff's Office (HCSO) detective working in an undercover capacity (the "UC"), investigators identified a cocaine trafficking cell based in Hillsborough County, Florida, and led by **SUAREZ-Aguilar**. During the course of the investigation, which began in 2022 and continued into 2023, the UC was able to make contact with **SUAREZ-Aguilar** by telephone and in-person. All of the telephonic communications described below were recorded and placed into evidence. The communications were in Spanish and a Spanish-speaking law enforcement officer translated the calls. Summarizations about certain portions of these communications are based on my training, experience, and knowledge of the investigation.

6.    On May 4, 2022, EG2 and HCSO coordinated a planned meeting between the UC and **SUAREZ-Aguilar**. At 3:30 p.m., surveillance was established on **SUAREZ-Aguilar** prior to meeting with the UC, while **SUAREZ-Aguilar** was at a local supermarket. At 4:23 p.m., officers observed **SUAREZ-Aguilar** depart from the supermarket and drive directly to his residence located at 612 River Bay Drive #A, Tampa, Florida 33619.

7.    At 5:04 p.m. officers watched the UC, who was driving an undercover vehicle, arrive at **SUAREZ-Aguilar's** residence and engage in conversation with **SUAREZ-Aguilar** in front of his residence. At approximately 5:07 p.m. surveillance

2

officers observed **SUAREZ-Aguilar** standing in front of his residence using his cellphone. **SUAREZ-Aguilar** met with the UC and told the UC to go into the residence while **SUAREZ-Aguilar** waited outside. Moments later, surveillance officers observed a white Hyundai arrive at **SUAREZ-Aguilar's** residence. **SUAREZ-Aguilar** walked to the passenger's side of the Hyundai and engaged in conversation with the driver. **SUAREZ-Aguilar** then walked away from the Hyundai to meet with the UC who had waited inside the residence. **SUAREZ-Aguilar** met with the UC inside the residence and **SUAREZ-Aguilar** sold the UC approximately two ounces of cocaine (tested positive for the characteristics of cocaine at DEA laboratory) for $2,400 in cash. **SUAREZ-Aguilar** then walked out of the residence and delivered the money to the man in the Hyundai before returning to the residence and continuing to converse with the UC. This meeting was audio and video-recorded for evidentiary purposes, and the recordings are maintained by HCSO. The following is part of the conversation between the UC and **SUAREZ-Aguilar:**

- **SUAREZ-Aguilar:** Those are the people that you call.
- **UC:** Yes, and they come.
- **SUAREZ-Aguilar:** That one is not of his word.

8.    Based on my training and experience, I believe that during this part of the quoted conversation, **SUAREZ-Aguilar** was speaking to the UC about his cocaine suppliers. **SUAREZ-Aguilar** claimed to have multiple cocaine suppliers

3

when he said, "those are the people." The UC then confirmed when he said, "yes, and they come," meaning the cocaine suppliers come to **SUAREZ-Aguilar** to deliver the cocaine. **SUAREZ-Aguilar** was telling the UC that his first choice of a cocaine supplier that day, the one who did not answer **SUAREZ-Aguilar's** calls, was not always reliable. The conversation continued about **SUAREZ-Aguilar's** health and other topics until the following conversation occurred:

- **UC**: This is my side job. You understand? But I always have people that are looking, are looking. Like how much do you think for five or six?

- **SUAREZ-Aguilar**: Easy.

- **UC**: Oh, easy, ok ok.

- **SUAREZ-Aguilar**: I have the people.

- **UC**: If I buy, if I get the money... (UC coughs) I'm gonna make you sick, I'm telling you. If I get the money, and, and get like five or six.

- **SUAREZ-Aguilar**: No, I will get the best price.

- **UC**: The best price is what I'm talking about.

- **SUAREZ-Aguilar**: Best price.

9.  Based on my training and experience, I believe the following about the quoted conversation: The UC was exploring whether he should purchase five or six ounces of cocaine from **SUAREZ-Aguilar**. **SUAREZ-Aguilar** then told the UC that

4

it would be easy, and the UC confirmed it with him. **SUAREZ-Aguilar** then said he had the people, alluding to his cocaine sources of supply. The UC then suggested to **SUAREZ-Aguilar** he (UC) would get the money and buy five or six ounces of cocaine, and **SUAREZ-Aguilar** then told the UC he (**SUAREZ-Aguilar**) would get the UC the best price. Cocaine suppliers typically sell multiple ounces of cocaine at a discounted price per ounce (which is lower than the price for one or two ounces of cocaine). The UC confirmed that he wanted the best price, and **SUAREZ-Aguilar** confirmed "best price."

10.    Between May 15, 2023, and May 17, 2023, the UC contacted **SUAREZ-Aguilar** (via telephone number XXX-XXX-4434) to arrange another meeting to purchase cocaine. During this time, the UC exchanged several calls with **SUAREZ-Aguilar**, in which **SUAREZ-Aguilar** agreed to sell the UC four and a half ounces of cocaine. The following is a synopsis of the calls that occurred on May 15, 2023.

- 10:54 a.m., 05/15/23: The UC called **SUAREZ-Aguilar** and asked him if he was ready, and **SUAREZ-Aguilar** said he was. The UC then told **SUAREZ-Aguilar** he needed four plates (referring to four ounces of cocaine), which **SUAREZ-Aguilar** agreed to supply. The UC then told **SUAREZ-Aguilar** he would be ready either Wednesday (May 17) or Thursday (May 18).

5

- 12:13 p.m., 05/15/23: The UC called **SUAREZ-Aguilar** and asked him how much **SUAREZ-Aguilar** would charge per ounce of cocaine, and **SUAREZ-Aguilar** told the UC he had to speak to his source of supply.

11.    On May 16, 2023, the UC and **SUAREZ-Aguilar** exchanged the following calls:

- 4:53 p.m., 05/16/23:  The UC called **SUAREZ-Aguilar**, and **SUAREZ-Aguilar** advised the UC it would be ten an ounce (referring to $1000 per ounce of cocaine). The UC told **SUAREZ-Aguilar** he would meet the following day around 12:00 p.m. **SUAREZ-Aguilar** then advised the UC he would call the UC an hour prior.

- 5:07 p.m., 05/16/23: The UC called **SUAREZ-Aguilar** and confirmed that it was going to be $1000 an ounce. The UC then ordered 4.5 ounces of cocaine from **SUAREZ-Aguilar**, which **SUAREZ-Aguilar** agreed to supply.

12.    On May 17, 2023, the UC and **SUAREZ-Aguilar** exchanged the following calls and text messages:

- 12:06 p.m., 05/17/23:  The UC called **SUAREZ-Aguilar**, who said he would call back and hung up.

- 12:27 p.m., 05/17/23: **SUAREZ-Aguilar** called the UC and asked him if he was ready, and the UC told him he was.  **SUAREZ-Aguilar**

6

further advised the UC to meet at the Latin market located near **SUAREZ-Aguilar's** residence.

- 12:38 p.m., 05/17/23: **SUAREZ-Aguilar** called the UC and asked where he was. The UC told **SUAREZ-Aguilar** he was on the way, and **SUAREZ-Aguilar** said he would see the UC at the store.

- At 1:21 p.m., surveillance officers observed the UC arrive at the Latin American Supermarket located at 7601 Palm River Rd., Tampa. At that time, the UC called **SUAREZ-Aguilar** and **SUAREZ-Aguilar** did not answer.

- 1:22 p.m., 05/17/23: The UC sent a text message to **SUAREZ-Aguilar**, "Estoy aquí" (translation: "I am here").

- 1:23 p.m., 05/17/23: **SUAREZ-Aguilar** called the UC, and the UC gave **SUAREZ-Aguilar** directions to where he (the UC) was parked.

13. Following that call, the UC observed **SUAREZ-Aguilar** walk towards the UC's vehicle and enter. At approximately 1:25 p.m., **SUAREZ-Aguilar** called what appeared to be his cocaine source of supply ("SOS"), and **SUAREZ-Aguilar** told the SOS he was with the UC. The UC overheard the conversation and noted that the SOS could be a Hispanic male (based on speech pattern) that **SUAREZ-Aguilar** was speaking with. The UC then asked **SUAREZ-Aguilar** for a kilogram of cocaine, and **SUAREZ-Aguilar** told the UC he (**SUAREZ-Aguilar**) could get it from Miami. **SUAREZ-Aguilar** said it would cost $18,000. **SUAREZ-Aguilar** said he

would go in the morning and would be back in the afternoon. The UC told him at that price he would probably get two, but he would let **SUAREZ-Aguilar** know when he (the UC) was ready. **SUAREZ-Aguilar** then asked the UC to park on the other side of the store, which the UC did. At approximately 1:41 p.m., **SUAREZ-Aguilar** called the SOS twice, but there was no answer. At 1:43 p.m., **SUAREZ-Aguilar** called the SOS and told the source to meet him (**SUAREZ-Aguilar**) at the same spot where they met before. **SUAREZ-Aguilar** was observed exiting the undercover vehicle and entering a grey Hyundai SUV, which then departed.

14.    At 1:54 p.m., **SUAREZ-Aguilar** returned and entered the undercover vehicle. **SUAREZ-Aguilar** handed the UC a sandwich baggie wrapped in a paper towel which contained suspected cocaine. The UC weighed the cocaine on a portable scale and then handed **SUAREZ-Aguilar** $4400 in cash. **SUAREZ-Aguilar** exited the undercover vehicle, and the UC departed from the area.

15.    The UC returned to a neutral location and conducted a field test on the suspected cocaine and the test was positive for the characteristics of cocaine. The UC impounded the evidence into HCSO evidence (the sandwich bag, paper towel and the cocaine weighed 129.0 grams). This narcotics transaction was audio/video-recorded by the UC. The calls between the UC and **SUAREZ-Aguilar** were also recorded. The recordings were placed into evidence according to HCSO policy.

16.    Between May 18, 2023, and August 2, 2023, the UC was in telephone contact with **SUAREZ-Aguilar** and negotiated to buy a kilogram of cocaine from **SUAREZ-Aguilar**. On June 14, 2023, the UC met with **SUAREZ-Aguilar** to buy

8

the kilogram of cocaine, but his SOS conducted counter-surveillance (looking for law enforcement vehicles and investigators) and suspected there were undercover vehicles in the area. The SOS communicated with **SUAREZ-Aguilar** and, according to **SUAREZ-Aguilar**, the SOS identified undercover law enforcement in the area and canceled the transaction at that time.

17. Between July 26, 2023, and August 2, 2023, **SUAREZ-Aguilar** and the UC exchanged several calls in which **SUAREZ-Aguilar** agreed to sell the UC a kilogram of cocaine. On August 1, 2023, **SUAREZ-Aguilar** and the UC planned to meet so **SUAREZ-Aguilar** could sell the kilogram of cocaine to the UC, but according to **SUAREZ-Aguilar**, his SOS was taking his time delivering the kilogram to **SUAREZ-Aguilar**. This meeting never occurred.

18. On August 2, 2023, the UC and **SUAREZ-Aguilar** exchanged the following calls:

- 11:05 a.m., 08/02/23: The UC called **SUAREZ-Aguilar** and asked what happened the day before. **SUAREZ-Aguilar** told the UC that the SOS was taking his time. The UC then asked **SUAREZ-Aguilar** if he (**SUAREZ-Aguilar**) wanted to do it that day, and **SUAREZ-Aguilar** said yes. The UC told **SUAREZ-Aguilar** they could do it (conduct the narcotic transaction for the kilogram of cocaine) in the afternoon, and the UC would give **SUAREZ-Aguilar** plenty of time. **SUAREZ-Aguilar** said he would call the SOS.

9

- 11:07 a.m., 08/02/23: **SUAREZ-Aguilar** called the UC and said they could meet whenever the UC wanted. The UC told **SUAREZ-Aguilar** he would call him (**SUAREZ-Aguilar**) when the UC was close (to the previous meeting location).

- 1:58 p.m., 08/02/23: The UC called **SUAREZ-Aguilar** and **SUAREZ-Aguilar** asked the UC when they were going to meet. The UC told **SUAREZ-Aguilar** around 3:00 p.m. at the trailer park.

- 1:59 p.m., 08/02/23: The UC called **SUAREZ-Aguilar** and asked him if he was with the SOS, and **SUAREZ-Aguilar** told the UC he had to call the SOS.

- 2:14 p.m., 08/02/23: The UC called **SUAREZ-Aguilar** and asked him what the SOS said (regarding the delivery of the kilogram of cocaine to **SUAREZ-Aguilar**). **SUAREZ-Aguilar** said "yes," and the UC told **SUAREZ-Aguilar** they would meet at three.

19.    Surveillance officers watched the UC drive to the meeting location (411 River Bay Drive) and park. At 3:10 p.m., separate surveillance units observed **SUAREZ-Aguilar** talking on a cellphone in front of a daycare center near the afore-mentioned Latin supermarket. **SUAREZ-Aguilar** was then seen walking southbound, empty-handed towards a green Ford Excursion (Florida Tag XXX I66), which **SUAREZ-Aguilar** then entered.

- 3:13 p.m., 08/02/23: **SUAREZ-Aguilar** called the UC and asked if he

10

was parked. The UC told **SUAREZ-Aguilar** he was parked, and **SUAREZ-Aguilar** told the UC he would park there presently.

20.    Surveillance units followed the Excursion **SUAREZ-Aguilar** had entered as it drove directly to the predetermined meeting location with the UC and **SUAREZ-Aguilar**.  At 3:16 p.m., the UC watched a green Ford Excursion park next to the UC's vehicle.  **SUAREZ-Aguilar** then exited the rear left passenger seat of the Excursion, and entered the undercover vehicle. The UC noted that **SUAREZ-Aguilar** was holding a cloth bag. **SUAREZ-Aguilar** removed a box from the cloth bag, and within the box, there was a plastic grocery bag.  The plastic bag, based on the UC's training and experience, contained what appeared to be a kilogram of cocaine. This meeting was audio and video-recorded for evidentiary purposes, and the recordings are maintained by HCSO.  The following is part of the conversation between the UC and **SUAREZ-Aguilar** after **SUAREZ-Aguilar** entered the UC's vehicle.

- **UC**: Who are those people?

- **SUAREZ-Aguilar**: Those are my cousins.

- **UC**: The what?

- **SUAREZ-Aguilar**: The cousins.

- **UC**: Your cousins?

- **SUAREZ-Aguilar** Yes.

- **UC**: Ok, they know what is going on?

11

- **SUAREZ-Aguilar** No, he knows everything. He was the one who picked it up.
- **UC:** That's his?
- **SUAREZ-Aguilar** Yes.
- **UC:** Okay.
- **SUAREZ-Aguilar** Yes, those are my cousins, both. There you have the whole kilo.

21. Based on my training and experience, I believe the following about the quoted conversation: During this part of the conversation, the UC was asking **SUAREZ-Aguilar** about the men in the Excursion in which **SUAREZ-Aguilar** had arrived. **SUAREZ-Aguilar** told the UC they were his cousins. The UC asked what and **SUAREZ-Aguilar** reiterated cousin(s). The UC then asked if they (the purported cousins) knew what was going on, meaning did they know about the cocaine transaction. **SUAREZ-Aguilar** confirmed a particular one knew about the cocaine and had picked it up from the supplier. As **SUAREZ-Aguilar** was pulling the kilogram of cocaine out of the packaging, the UC asked if that (meaning the cocaine) was his (the purported cousin's), and the UC said, "Okay". **SUAREZ-Aguilar** added they were both his cousins as he continued removing the kilogram from the bag and box and handed the "whole kilo" to the UC.

12

22.    At that time, the UC gave a signal to law enforcement officers, who then approached and took **SUAREZ-Aguilar** and both subjects in the Excursion into custody. This narcotics transaction was audio/video-recorded by the UC. The calls between the UC and **SUAREZ-Aguilar** were also recorded. The recordings were placed into evidence according to HCSO policy.

23.    The UC moved to a neutral location and conducted a field test of the suspected cocaine, and the result was positive for the characteristics of cocaine. The UC impounded into HCSO evidence approximately 1167.0 grams of cocaine (weight with bag), a plastic grocery bag, a box, a cloth bag, two Samsung phones and one iPhone. During evidence processing, the UC noted that prior to impounding **SUAREZ-Aguilar's** cellphone, the screen was open. The UC noted **SUAREZ-Aguilar** had called the UC's number and the UC took a screen shot of **SUAREZ-Aguilar's** phone.

13

## Conclusion

24.    Based upon the totality of the facts set forth in this affidavit, I believe that there is probable cause to believe that **Pedro Jesus SUAREZ-Aguilar** and others did knowingly and intentionally possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841.

I declare under oath and penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Eric Hery
Special Agent
Drug Enforcement Administration

Affidavit submitted to me by reliable electronic means and attested to me as true and accurate by telephone or other reliable electronic means consistent with Fed. R. Crim. P. 4.1 and 4(d) before me this ____6____ day of December, 2023.

_____
SEAN P. FLYNN
United States Magistrate Judge

14